## Case No. 3,666.

### The DAWN.

[2 Ware (Dav. 121) 126;[1] 4 Law Rep. 106; 26 Am. Jur. 216.]

District Court, D. Maine. Feb. Term, 1841.

SEAMEN'S WAGES — SALE OF SHIP IN FOREIGN COUNTRY—WRECK—EXPENSES OF RETURN HOME —DUTY OF SEAMEN—EXTRA REWARD.

1. The libellant shipped for a voyage from Boston to Turk's Island. The ship, soon after leaving port, was so much damaged by the fortune of the seas, that the master, for the safety of the lives of the crew, put into Bermuda, where a survey was called, and she was condemned and sold as a wreck, and her crew discharged. Wages were paid to the libellant until he arrived at Bermuda. By his libel, he claimed either the two months' wages allowed to seamen on the sale of a vessel in a foreign port, and the discharge of the crew, by the act of congress of February 28, 1803, § 3 [2 Stat. 203], or a sum in addition to his wages to pay his expenses home.
   [Criticised in Drew v. Pope, Case No. 4,080.]

2. The act of congress applies only to the case of a voluntary sale of a vessel, and not to a sale rendered necessary by misfortune; *held*, that the libellant was not entitled to the statute allowance, but was entitled to a sum in addition to his wages to defray the expenses of his return home, to be paid from the proceeds of the sale of the vessel.
   [Cited in Brown v. Chandler, Case No. 1,998.]

3. Generally, when the performance of a contract has become impossible by a fortuitous event, the parties are discharged from its obligations.
   [Applied in The Wenonah, Case No. 17,412. Cited in Thorson v. Peterson, 9 Fed. 520.]

4. On the happening of any disaster to a vessel, by which the prosecution of the voyage is rendered impossible, the seamen are discharged from the principal obligation of performing the voyage; but they are not released from the incidental obligation of rendering their best services for saving as much as practicable of the ship and cargo.
   [Cited in The John Perkins, Case No. 7,360. Approved in The Bowditch, Id. 1,717.]

5. The opinions of Valin and Pothier on this subject examined and questioned.

6. On the principles of the common law, applicable to the contract of hiring of labor and service, a party cannot ordinarily claim an extra compensation, on the ground that, by some unexpected event, the service which he has agreed to perform, becomes more laborious and dangerous than was anticipated at the time of the contract.

7. The maritime law, on principles of public policy, makes an exception to this general rule, in cases of shipwreck.

[1] [Reported by Edward H. Daveis, Esq.]

8. In cases of shipwreck, the seamen are entitled to their full wages up to the time of the disaster, provided, by their exertions, enough is saved of the freight and wreck to pay them.

9. The old rule in England, that freight is the only fund against which wages can be claimed, was never the rule of the maritime law, and was never adopted in this country.

10. The ship, together with the freight, is, to the last fragment, hypothecated to the seamen for their entire wages, tota in toto et tota in qualibet parte.

11. In cases of shipwreck, the seamen are entitled to claim, according to the merit of their services, an extra reward, beyond their wages, against the property saved. This ought not generally to be less than the expenses of their return home. This, being of the nature of a salvage reward, may be allowed, as well against the savings of the cargo, as against the fragments of the ship. The decisions of the American courts quoted and commented upon. The doctrines of the maritime ordinances of the middle ages, on this subject, examined.

[Cited in The Niphon's Crew. Case No. 10,277; The John Perkins, Id. 7,360. Followed in Nickerson v. The John Perkins, Id. 10,252. Explained in Hoffman v. Yarrington. Id. 6,-580. Cited, but not followed, in Kelly v. Otis, 23 Fed. 905.]

12. Under these ordinances, and the usages of the age when they were framed and established, the contract of seamen took a peculiar character. Their wages were made to depend on the successful termination of the enterprise. If that totally failed, contrary to the common principles of the contract of hire of labor or service, there was a total loss of wages. There is no trace of such a usage in the Roman law, nor in that ancient collection that goes under the name of the Rhodian laws, nor in the legislation of the Lower Empire. On the western coast of Europe, it appears to have been nearly coeval with the revival of commerce, after the fall of the Western Empire.

13. On this restriction contrary to common right, as a compensation and having its origin in the same policy of connecting the interest of the crew with the safety of the ship, was engrafted another principle, that, in cases of shipwreck, the seamen should be paid, out of the effects which they saved, a compensation beyond their stipulated wages, in the nature of salvage.

This case was before the court several terms ago, and is reported in Ware, 485 [Case No. 3,665]. After the opinion was then delivered, the counsel for the respondent moved the court to suspend the decree, to enable the party to offer further evidence to show the actual condition of the vessel, when she arrived at Bermuda. Under the circumstances of the case, the court allowed the motion. The case was now presented on the new evidence. The material facts upon the whole case were as follows. The libellant shipped on board the brig Dawn at Boston, Nov. 26, 1836, as mate for a voyage to Turk's Island, for wages at 25 dollars a month. Soon after the brig left port, she encountered violent gales, by which she was so much damaged in her hull and rigging, as to be incapable of continuing the voyage, and the master, for the safety of the lives of the crew, bore away for Bermuda, where she arrived on the 28th of December. The master then made his protest, and applied for a survey. Commissioners were appointed for that purpose by the governor, who, after an examination, reported, that from the great damage which the brig had received in her spars and rigging, and especially from the disabled state of her hull, connected with her great age, she was unfit for sea, and unworthy of repair; and she was subsequently sold as a wreck. The additional evidence, now introduced, went to confirm the report of the surveyors, and to prove the ruinous condition of the vessel, and to show further the great expenses of the repairs, which would have been required to fit her for sea. The crew were discharged, and paid their wages up to the time of the discharge. The libellant claimed, in addition, two months' wages allowed by the act of congress of February, 1803, § 3, upon the sale of a ship and the discharge of her crew in a foreign port, or upon the discharge of a seaman in a foreign country with his own consent; and if, under the circumstances of this case, he was not entitled to claim under the statute, an alternative claim was set forth in the libel for a reasonable compensation, in addition to his wages, in the nature of salvage for his extra labor and services in saving the vessel, and to pay his expenses home.

C. S. Daveis, for libellant.

T. A. Deblois, for respondent.

WARE, District Judge. I do not think it necessary, on this occasion, to say much upon the claim for the statute allowance of two months' additional wages, which are directed to be paid to the consul for the seamen's use on the sale of a vessel in a foreign port or when a seaman is discharged in a foreign country with his own consent. When this case was before the court at a former term, that question was fully considered, and the conclusion to which my judgment was brought, by that examination, was that the statute applied only to the case of a voluntary sale of the vessel, and to a strictly voluntary discharge of a mariner, and not to a sale or discharge rendered unavoidable by an imperious and overruling necessity. But when a vessel is sold in a foreign port, the case is within the words of the statute, and if the owners would exempt themselves from its operation, it belongs to them to show that the sale was involuntary on their part. As the evidence then stood, it did not appear to me that the necessity of the sale was sufficiently established by the proof; but, under the peculiar circumstances of the case, it seemed to be reasonable to suspend the decree, and allow the owner to offer further evidence to that point. The evidence now produced does, in my opinion, satisfactorily show that the sale was, in the reasonable meaning of the word, a sale of necessity. Not that it was physically impossible to repair the vessel and proceed on the voyage; for it is always possible to repair or rebuild a vessel, while any part of the hull remains. But the damages

were so extensive, and the expense of the repairs would have been so considerable, that it was, beyond question, greatly for the interest of those on whom the loss must ultimately fall, to abandon the voyage and sell the materials preserved for the most they would bring. A sale is, within the mercantile and reasonable sense of the word, necessary, when the vessel cannot be repaired but at a great sacrifice of the interests of the owners. And when a voyage is broken up for such cause, the seamen are not properly discharged, but the whole enterprise is brought to a premature conclusion by a fortuitous event, for which neither party is responsible.

The other question raised by the pleadings in this case is, whether, upon a shipwreck and loss of the vessel in a foreign country, the seamen, who have remained by the ship and faithfully performed their duty to the last, can, upon the principles of the maritime law, claim a compensation, out of the property which they save, beyond their stipulated wages up to the time when their connection with the ship is finally dissolved, sufficient to pay their expenses home. This question has been very ably and elaborately argued on both sides; and the authorities bearing upon it have been widely examined. But, with all the researches of counsel, no adjudged case has been found, in which the question has been directly and formally decided.

It is contended by the counsel for the libellant that this claim is founded on an ancient principle of the maritime law of Europe, incorporated into the earliest digests of the law, and recommended as well by the dictates of justice and humanity as by an enlarged and enlightened public policy; that if it is not directly sanctioned by any judicial precedents, neither are there any by which it is directly negatived; but, that there are cases in which a compensation in the nature of salvage may be allowed, beyond the amount of wages due, is fairly inferable from the doctrines of many of the adjudged cases, and is in fact but a just application of the general principle of the marine law, which studiously connects the interest of the crew with the safety of the vessel and cargo. On the other side it is argued, that the claim cannot be supported as one flowing from the contract, all rights under that being satisfied by the payment of wages up to the time when the contract was dissolved by an accident of major force; that it cannot be maintained as a salvage reward, because the ship's company can, it is said, in no case claim as salvors, being bound by their contract to use, on these melancholy occasions, their utmost exertions for the preservation of the ship and cargo for their stipulated hire; and the silence of our jurisprudence, on a question which must have frequently been presented to the court, has been strongly urged as a proof that no such principle, as that contended for in behalf of the libellant, is acknowledged by the maritime law of this country. And it is further contended, ad-

mitting the rule of the maritime law to be, that upon a shipwreck in foreign parts, the crew are entitled to claim against the savings from the wreck a sum sufficient to pay their expenses home, that this rule is superseded, in this country, by the acts of congress for the relief of destitute mariners in foreign countries, requiring the consuls of the United States to provide for their return at the public expense. Such I understand to be the general tenor of the arguments at the bar.

I agree with the counsel for the respondent, that by the maritime law, as it is received in this country, the seamen are bound to remain by the wreck and contribute their utmost exertions to rescue as much as possible from the violence of the elements, so long as there is a reasonable probability of saving any thing, without too much hazard of life. It is true, that a different view is taken of the obligations of the crew by the most distinguished maritime jurists of France. Valin says, that in case of shipwreck the seamen are at liberty to abandon the ship, although he admits that his opinion is in opposition to the decision of the judgments of Oleron and the ordinance of the Hanse Towns. The reason, he says, is, that in this case the owner is under no personal obligation to pay their wages or the expenses of their return home, and consequently, if they refuse to aid in saving the property, he has no cause of complaint. 1 Comm. sur Ordinance de la Marine, liv. 3, tit. 4, art. 9, p. 704. Pothier maintains the same doctrine. By the accident of major force, he says, which prevents the continuation of the voyage, the parties are freed from their engagements, and the seamen are no longer under any obligation to continue their services. Cont. Mar. No. 127. Boulay-Paty, without being very explicit, seems silently to acquiesce in the same conclusion. 2 Cours de Droit Mar. 230, 231.

But, notwithstanding the imposing authority of these great names, it appears to me that this doctrine is exposed to very grave objections. It is true indeed as a general principle, when the performance of a contract is rendered impossible by a fortuitous event, that the parties are freed from its obligations. And in this case, the prosecution of the voyage having, by an accident of major force, become impossible, the seamen are undoubtedly discharged from the principal obligation of the contract, that of performing the voyage. But as incidental to that, they are bound at all times to exert themselves for the preservation of the property intrusted to their care. It would be singular if they were released from this collateral obligation on the happening of an event, which rendered it peculiarly necessary. It appears to be a duty, resulting directly and necessarily from the nature of their engagement, to render their utmost exertions, on these occasions, to save all that is possible for their employers. This duty is expressly enjoined upon them in nearly all the old maritime ordinances. The law

is so stated by Abbott, in his treatise on Shipping (part 5, c. 2, § 2). And so it has, I believe, been uniformly held in this country. Sims v. Sundry Mariners [Case No. 12,893]; The Two Catherines [Id. 14,288]. So long as these services are continued, their right to wages, under the contract, remains in full force, and their lien against the fragments of the wreck which they preserve. But, by abandoning the wreck, they forfeit their wages, nor will their right be restored should the wreck be saved by other hands. 3 Kent, Comm. 196; The Two Catherines [Case No. 14,288]; Pitman v. Hooper [Id. 11,185].

But the question presented in this case is, whether the seamen can claim anything beyond the full amount of wages up to the time of the actual termination of their services. It is quite clear that this claim cannot be maintained upon the common principles applicable to the contract of hiring. Having agreed to perform the service for a stipulated price, they cannot maintain a claim for extra compensation, although, by some fortuitous event, that service may have been rendered more laborious, or have involved more danger than was anticipated. However just and reasonable such an allowance may, in some cases, be, as a pure question of casuistry, it cannot be sustained upon any established and known principle of law. Do, then, the principles and policy of the maritime law furnish any ground for making an exception in favor of maritime services, to the general rule of the common law? After an attentive consideration of the subject, and an examination of all the sources of information within my reach, I am brought to the conclusion, that to some qualified extent they do; and I will now proceed to explain somewhat at large the grounds upon which this opinion is founded.

No case was cited at the bar, in which this question has been decided, at least in the form in which it is presented in this case. There are, however, several, in which the general subject of the claims of seamen in case of shipwreck, against the fragments which they save, is considered. Chancellor Kent, in his Commentaries, in speaking of shipwreck in connection with wages, says that "some of the decisions in this country seem to consider the savings of the wreck as being bound for the arrears of the seamen's wages, and for their expenses home." 3 Comm. 195. Here the expenses home are spoken of as a charge on the wreck, in addition to the arrears of wages. And I refer to this paragraph, not so much as an authority in support of the doctrine, as to show that the idea, that the crew may be entitled to something beyond their wages, is not such a novelty in our jurisprudence, as was supposed at the argument. In the case of the Two Catherines [supra], the vessel had performed her outward voyage and earned freight, and was wrecked, and the cargo totally lost on her return, in Narragansett bay, near her home port. The libel was framed with a double aspect, claiming, in the alternative, wages or salvage. The question, what was due to the crew, appears to have been elaborately argued at the bar, and was profoundly examined by the court. The conclusion of the court was, that no wages were due, but that the crew were entitled to salvage against the materials, which they had saved of the vessel. The court held, that there was no principle of law which authorized the position, that the character of seamen creates an incapacity to assume the character of salvors, and that the salvage should never be less than the amount of wages, which would have been due had no disaster happened, but may, according to the circumstances of the case, be more. I am aware of the language used by the same learned judge, in delivering the opinion of the court in the case of Hobart v. Drogan, 10 Pet. [35 U. S.] 122. But it does not appear to me to be inconsistent with the decision of this case, nor to take from its authority.

In the case of Taylor v. The Cato [Case No. 13,786], the ship was lost at sea, and the crew taken from the wreck by another vessel. Part of the crew of the Cato assisted that of the salvor vessel in saving a portion of the cargo, and they were allowed to claim, as subordinate and auxiliary salvors, one-half the share that was allowed to the crew of the salvor ship. Judge Peters observed, in delivering his opinion in that case, that "the third article of the laws of Oleron has been produced, together with the commentaries upon it, to show that seamen, saving from a wreck, are entitled to a reward, when sufficient property is saved, beyond the amount of their wages." "I have," he says, "never disputed the doctrine in cases to which it seemed applicable." In another part of his opinion he adverts to a previous decision he had made in the case of The Belle Creole [Id. 17,165], upon a state of facts similar to those of the Cato, and says, "I do not exactly recollect by what rule I estimated the quantum of wages I ordered to be paid out of the surplus, to the officers and crew of the Belle Creole, but I think it was beyond the amount of wages." I shall have occasion, presently, to remark particularly on the third article of the laws of Oleron, and it will be seen how it applies to the present case. The case of Weeks v. The Catherine Maria [Id. 17,351], was that of a vessel foundered at sea. A part of the cargo was saved by the aid of another vessel, in which the crew were brought home. Salvage was allowed to the crew of the salvor vessel, and the crew of the lost vessel were allowed their wages from the property saved, which was part of the cargo, not only to the time of the abandonment of the ship, but to the time when the goods were brought into port and were taken into the custody of the marshal, under the process of the court. In the case of Adams v.

The Sophia [Id. 65], the vessel was wrecked on her return voyage to Philadelphia, on the capes of the Delaware. The cargo was entirely lost, but some of the spars and rigging of the vessel were saved. The seamen filed a libel against the relics of the vessel for their wages, and the mate a separate libel, claiming salvage. The court held that the claim for wages could not be sustained, on the ground that freight is the mother of wages and that, when the freight is entirely lost, no wages eo nomine are due. But it was further decided, that although nothing could be recovered as wages, the seamen were entitled to claim as salvors, and that the amount, which would have been due as wages had the disaster not happened, might be recovered as salvage. The libel of the seamen was, therefore, dismissed, and the mate recovered the amount of his wages under the title of salvage.

All these cases clearly sustain the principle, that the seamen, in the event of shipwreck, are entitled to claim against the property which they have saved, in the quality of salvors. It is true that in the case from Gilpin, this seems to be treated as a substitute for the claim of wages, and to be measured by the amount which would be due if the disaster had not occurred. In the other cases, it is clear that the court thought it might exceed that amount, and in that of the Catherine Maria, more was in fact awarded. And if the claim is valid for salvage, it would seem, as in all other cases of salvage, it must be discretionary as to the amount, to be determined by the particular circumstances of the case. But all these cases are open to one general remark, which may be thought to detract something from their authority in support of the principle contended for in the case at bar; it is this, that it seems to have been tacitly assumed that the wages were lost by the calamity which prevented the earning of freight, and, therefore, if the seamen could not be rewarded for their services in the way of salvage, they could claim nothing. Undoubtedly it was formerly the doctrine of the English courts, that freight was the only fund out of which wages could be claimed, and of course when freight was not earned no wages were due. Holt, Shipp. 275. But that is now overruled in England (The Neptune, 1 Hagg. Adm. 227), and it was never received in this country but with material qualifications. Freight is, indeed, the natural fund for the payment of wages, and the seamen have a privileged claim against it. It is a right which does not stand merely on a dry rule of positive law, but is derived from the nature of things, for it is in part the product of their own labor. But, by the maritime law, the ship is as much pledged for wages as the freight. When the interests of third parties are involved, as between underwriters when the ship and freight are insured by separate policies, it would seem, upon principles of natural law, that the freight ought first to be exhausted, and the vessel resorted to only as a subsidiary fund when the freight proved insufficient. This was the opinion of Emerigon (Traité des Assurances, art. 17 §§ 11, 53), and, in a proper case, the court may, perhaps, have the power of marshaling the funds to meet the claims of natural justice. But, at all events, the seamen are to be paid their wages, when enough for that purpose is saved of the ship or freight. Pitman v. Hooper [Case No. 11,185]. It is not pretended that these authorities establish the principle as a settled rule of jurisprudence in this country, that upon shipwreck, when part of the property has been saved to the owners by the exertions of the crew, they are entitled to an allowance in the nature of salvage, beyond the amount of their wages. But to me they seem to prove, at least, that the opposite rule is not established, and that the question is fairly open to be decided upon principle and the authority of the general maritime law.

We will now inquire what grounds it has for its support in the general doctrines of that law. The policy of connecting the interest of the crew with the safety of the ship and cargo is deeply imbedded in the principles of the maritime law. The ship and freight are the only pledge they have for their wages. Their lien upon these and every part of them attaches as a privileged hypothecation, tota in toto et tota in qualibet parte, or, as it has been emphatically expressed, to the last plank of the ship and to the last fragment of the freight. Jugemens D'Oleron, art 3; Consulat de la Mer. c. 132 (Pardessus' Ed. 92); Emerigon des Assurances, c. 16, §§ 11, 2; Pitman v. Hooper [supra]. But this is the whole of their security. If the ship and freight are wholly lost, there is a total loss of wages; and though the ship may be lost on the most distant and inhospitable shore of the ocean, they are not only left penniless to find their way home as they can, but when, through many hardships, they have arrived there, however long and perilous their service may have been, they have no personal claim against the owner, unless freight, in the course of the voyage, has been saved and put on shore. Upon the common principles of the contract of hiring service or labor, the title of the laborer to his reward depends upon the faithful performance of the service for which he is engaged, and is not liable to be defeated by the accidents of fortune. 2 Kent, Comm. 590; Poth. Cont. de Louage, No. 423. The principle which attaches the right to wages to the fortune of the vessel, or, in other words, makes the right dependent on the successful issue of the enterprise for which the men are hired, is a peculiar feature of the modern maritime law. No trace of such a principle is to be found in the Roman law nor in the maritime legislation of the Eastern Empire nor in that an-

cient compilation which goes under the name of the Rhodian laws. 1 Pard. Lois Mar. p. 325, note 3. It owes its origin to the necessities and peculiar hazards which maritime commerce had to encounter in the middle ages, when to the dangers of the winds and waves were added the more formidable perils of piracy and robbery. The principle having been then established, and found by experience to be favorable to the general interest and security of commerce, it has been preserved in the maritime jurisprudence of Europe, when the special necessities in which it had its birth have ceased to exist.

It is, then, to the maritime customs and usages of the middle ages, in which this restriction upon the right of wages had its origin, that we are to look for its nature and quality, as well as for any countervailing advantages to the seamen, by which this abridgement of the rights naturally resulting from their contract was compensated, and the scales of justice, which had been made to incline in favor of the employer, were equitably readjusted. If we retain the harsher principles of the old law, it is but just that we should also preserve the temperaments by which its severity and apparent injustice were mitigated.

The earliest monument of the maritime jurisprudence of the middle ages which remains, unless we accept the Consulate of the Sea, is the Judgments of Oleron.[2] The rule is there stated in these terms: "When a vessel is lost, in whatever place it may be, the seamen are bound to save all they can of the wreck and cargo. In this case the master shall pay them their reasonable wages and the expenses of their return home, so far as the value saved is sufficient; and if he has not money enough, he may pledge the objects saved to bring them back to their country. If the seamen refuse to labor for the salvage, there is nothing due them, and on the contrary when the ship is lost, they lose also their wages." Article 3. The rule cannot well be more explicitly declared than in this article. If the ship is totally lost, the seamen lose their wages; but, against the effects which their exertions have rescued from destruction, they have a claim not only for the full amount of their wages, for that I understand to be meant by their reasonable wages, but also for a further sum to defray their expenses home. Thus we see that in the very origin of the custom which restricted the right of seamen for their wages to the effects which they saved, it was connected with another of allowing them against these effects an additional reward for their labor in saving them. The Judgments or Roles, or, as they are more frequently called in this country, the Laws of Oleron, do not appear, at first especially, to have been sanctioned by any direct act of legislation. They are, apparently, a collection of maritime

usages to which custom had given the force of law; but they have at all times been referred to as of high authority by all the most commercial nations of Europe. They were the earliest digest of maritime law in the western part of Europe, and from the general wisdom and equity of their decisions, as well as from other causes, they seem, in one form or another, to have been early incorporated into the maritime jurisprudence of all the western nations of that continent. Being a work of French origin, they were received as common law in Aquitaine, Brittany, Normandy, and the whole extent of the Atlantic coast of France. In England they early acquired nearly the same authority from an opinion there entertained, that they were originally compiled and published by Richard I., in his character of Duke of Aquitaine, on his return from the Holy Land. In the latter part of the twelfth century they were adopted by Alphonso the Wise, King of Castile and Leon, and thus became the law of the northern coast of Spain. 1 Pard. Lois Mar. pp. 301, 306; 2 Pard. Lois Mar. p. 29; 1 Bl. Comm. 418; 2 Bl. Comm. 423. They were at an early period translated and adopted as the maritime law of Flanders, under the names of the Judgments of Damme and the Laws of West Capelle. 1 Pard. Lois Mar. c. 9. The third article above quoted is in its substance incorporated into the ordinance of Philip II., of 1563 (part 4, art. 12). 4 Pard. Lois Mar. 24. In the more northern countries, this Code does not appear to have been received as common law; but the general principles and usages which it established, were incorporated into their own ordinances. The whole of the first twenty five, which were the primitive articles, are transferred to the ordinance of Wisbuy, from the fifteenth to the thirty-ninth article. The seventeenth article of the Laws of Wisbuy is almost a literal translation of the third of Oleron. The Hanseatic ordinance, without copying so closely the article of Oleron, arrives at nearly the same conclusion. In case of shipwreck, the crew are required to assist the master in saving the wreck and cargo, for an equitable compensation in salvage, to be taken from the wreck and the merchandise, according to the judgment of arbiters. If the master has not money, he shall carry the seamen back to their country, if they choose to follow him. But if the seamen do not assist, the master is not bound to pay them anything, and those who have not done their duty are liable to corporal punishment. When the ship perishes, the whole that is saved is pledged to pay the totality of the wages. Ord. 1614, tit. 4, art. 29, and tit. 9, art. 5; Ord. 1591, art. 45. The law of Denmark requires the master and crew to save the ship and her rigging as well as the cargo, and a compensation shall be paid them according to the opinion of good men. On the other hand, the freight due from the shippers on the merchandise saved,

---

[2] [See note at end of this case.]

as well as the wages of the crew, shall be paid in proportion to the part of the voyage performed. The mariner who will not aid in saving the ship and cargo shall lose his wages, even what has been advanced, and be regarded as infamous. Code Frederic II. (1561) art. 24; 3 Pard. Lois Mar. p. 250. The same rules are established by the laws of Hamburgh. The crew are bound to exert themselves to save the vessel and cargo for an equitable recompense, and if they refuse their assistance, the master shall pay them neither their wages nor anything else. St. 1603, tit. 17, art. 1; 3 Pard. Lois Mar. 325. The law of Lubec substantially agrees with that of Hamburgh. It requires the master and crew to exert themselves to save the vessel and cargo, and allows them an equitable compensation, to be determined by arbiters. He who does not assist shall be paid nothing, and shall besides be deprived of his wages. Official Code (1586) tit. 3, art. 3; 3 Pard. Lois Mar. 444. The Prussian law also enjoins the same duties upon the crew, and requires the merchant to pay them a liberal reward, "honestum premium viri boni arbitrio." Code Duchy of Prussia (1620) lib. 4, tit. 12, art. 3, § 3. The Maritime Code of Charles XI. of Sweden, as well as several of the ordinances of the northern nations, prescribes particularly the course to be pursued by the master on these occasions. He shall first save the crew, then the rigging of the ship, and lastly the cargo, for the saving of which he shall employ the boat and the services of his crew, for an equitable compensation. When the ship and cargo are entirely lost, the master and crew can demand nothing that is due to them. But if they save of the wreck the amount of their wages, they shall be paid without deduction. No one shall have a reward for a salvage who has not aided; and he who has saved effects may detain them until he is paid. Code Car. XI. (1667) pt. 5, c. 2; 3 Pard. Lois Mar. 170. And finally, the maritime legislation of Russia inculcates the same principles, imposing on the crew the obligation of saving what they can from the wreck, and giving them an equitable compensation for the salvage. St. Riga (1672) tit. 5, art. 1; 3 Pard. Lois Mar. 520. The French ordinance of marine, of 1681, was framed upon a review of all the antecedent maritime legislation of Europe, improved and corrected, it is said, by information sought from practical men in every part of the continent. And so admirably was the task executed by the great man who digested it, that from its first publication it was generally acknowledged as constituting in some sort the text of the commercial law of all nations. In this celebrated Code we find the same principles established and confirmed. When the ship and merchandise are entirely lost, it is followed by an entire loss of wages. But if any part of the vessel is saved, the seamen engaged for the voyage or by the month shall be paid their wages.

If merchandise only is saved, they shall be paid their wages in proportion to the freight received. But at all events they shall be paid for their days employed in saving the wreck and the effects shipwrecked. Liv. 3, tit. 4, arts. 8, 9. The same principles are preserved in Code de Commerce, art. 261.

It is certainly a little remarkable, in passing to the southern coast of Europe, that we find but very slight traces of a custom that seems from the earliest times to have prevailed on the Atlantic coast, that of allowing to the crew something in the nature of salvage from the property they save from the wreck. There is one chapter in the Consulate of the Sea, from which perhaps a custom may be inferred of allowing to seamen the expenses of their return home, when the vessel is lost on a foreign coast. It provides that when a ship sails to the countries of the Saracens, and falls into the hands of enemies, or is lost by the fortune of the seas, if the master receive no freight, he shall not be bound to pay the seamen anything. "The master," says the Consulate, "who by one of the causes mentioned loses his vessel, is not obliged to furnish the means of passage nor provisions for the seamen till their return to a Christian country, because he has lost all he had, and peradventure more." Chapter 228, p. 194 (Pardessus' Ed.) The reason given for exempting the master from the charge in this case, leaves room for the conjecture, that if part of the wreck had been saved by the crew, they might, by custom, be entitled to some allowance from it. The law of Genoa provides, when any disaster happens to a Genoese vessel, that the crew shall be bound to remain with the master and assist in the salvage, and that the master shall provide for their board and pay them double wages while they are employed in this service. Statutum, 1441, c. 94; 4 Pard. Lois Mar. 519. This is all I have been able to find in the legislation of those countries which border on the Mediterranean, indicating the existence of such a custom; while the ordinance of Peter IV. of Arragon and Valentia, by its silence, seems to negative it. It allows the seamen their wages in these cases to the time of the expiration of their service, provided they exert themselves to save the wreck and cargo, but nothing more, and visits upon their refusal to aid, the penalty of the forfeiture of all wages, even of that which has been paid in advance. Ord. 1440, art. 17; 5 Pard. Lois Mar. 357.

From this review of the maritime legislation and jurisprudence of Europe, and more particularly of the western nations of Europe commencing with the Judgments of Oleron, in the twelfth, to nearly the close of the seventeenth century, we find, either by positive ordinances, or by immemorial usages having the force of law, one prevailing rule applying to the case of shipwreck upon the whole extent of the Atlantic coast. It required the ship's company, in case of dis-

aster, to exert themselves to the utmost of their ability to save as much as possible of the ship and cargo, generally under the penalty, for the refusal or neglect to perform this duty, of a forfeiture of wages, and in some cases of additional punishment; but restricting their claim for wages to the effects which they save, and allowing them, against those effects, some reward beyond the amount of their wages stipulated by the contract. These principles seem to have been incorporated into the early law of every maritime state on the Atlantic coast, from the extreme west of the Spanish peninsula to Sweden, including the ports of the Baltic. Such a general concurrence, of itself, raises a strong presumption that they are, taken together, founded in justice and wisdom. But independent of the authority of general usage, these principles appear to me to have their foundation in just and enlightened views of public policy, their object being to connect the fortune of the crew with that of the vessel, and thus fortify the obligations of social duty by the ties of pecuniary interest. They are strongly maintained by Mr. Justice Story, in the case of the Two Catherines, before referred to. "In my judgment," says he, "there is not any principle of law, which authorizes the position, that the character of seamen creates an incapacity to assume that of salvors; and I cannot but view the establishment of such a doctrine as mischievous to the interests of commerce, inconsistent with natural equity, and hostile to the growth of sound morals and probity. It is tempting the unfortunate mariner to obtain by plunder and embezzlement, in a common calamity, what he ought to possess upon the purest maxims of social justice." The Two Catherines [Case No. 14,288]. The rule which restricts the claims of seamen for wages, to the effects which they save, is one of naked policy; but that which allows them against these effects some reward beyond their wages, seems to be a principle of natural equity, that is, that when property has been rescued and saved to the owner from extraordinary perils by extraordinary exertions, the fund which is thus saved owes something to the hand which has preserved it. If it be said, that the services by which it was saved were due under the contract, the nature of that contract ought also to be considered. Upon principles of public policy, contrary to natural justice and the general law of the contract of hiring in all other cases, if the ship is totally lost without any fault of the mariner, he loses his entire wages. But if a mechanic is hired to build a house, and before it is finished the building is destroyed by an earthquake or burnt by lightning, he is not, on this account, the less entitled to his wages. Dig. 19, 12, 59. Or if workmen are employed to build a dike, and before the work is accepted by the employer it is destroyed, not from any fault of the workmen, but from the defect of the soil, as any other extraneous cause, the laborer is still entitled to his hire. Id. 19, 2, 62. The loss in such cases falls upon the owner or employer; and justly, for the whole profits, on the successful issue of the enterprise, would have gone to him. It is not so with the seaman. He can be paid only from the fund which he has brought home to the owner; and his compensation is made dependent on the accidents of fortune, as well as on his fidelity. It is no more than a just compensation for this inequality of the contract, when by extraordinary exertions of skill and intrepidity he has saved the fortune of his employer from extraordinary perils, that these labors should be acknowledged by some reward beyond his stipulated wages. And the policy of the principle appears to me to be as clear as its justice. It is a reward held out to induce the crew to persevere and exert the utmost of their skill and courage, even beyond what a court might think itself justified in requiring under their contract, to save what otherwise would be irretrievably lost to the owner. If they can look to nothing beyond their wages, they will naturally be inclined to relax their efforts, when enough has been saved for that purpose. They will also turn their attention exclusively to saving that which is pledged for their wages, that is, the ship, to the neglect of the cargo. An observation of Judge Peters, whose extensive experience as a maritime judge entitles his opinion on subjects of this kind to great consideration, is well deserving of attention. In the case of The Cato, he remarked: "There is a mistake evidenced by some of the counsel in this and other salvage cases, as to the principles regulating the payment of wages to the seamen in the cases of wreck. The old law was that they were payable only out of such parts of the wreck of the ship, her cables and furniture, as were saved; but it was found that under this impression the mariners were occupied in saving those articles from which they derived an advantage, and, to insure this, they suffered the goods to perish. Modern authorities are clear that both ship and cargo, or such parts as are saved, are alike responsible; though it should seem that the old fund, to wit, the part of the ship's materials and furniture saved, should be exhausted before the cargo be made answerable." The mind of Judge Peters seems to have been vibrating between wages and salvage. Sometimes he calls the claim by one name and sometimes by the other. It seems to me that the seamen, in these cases, have two distinct claims, one for wages and another for salvage. Their wages are to be paid exclusively from the materials of the ship, they being pledged for that purpose, and the full amount due is to be paid without deduction. But they have no claim for wages against the cargo, except for the freight due upon it. Their claim for salvage is against the general mass of the

property saved, and, as in all cases of salvage, the amount is uncertain, depending upon the particular circumstances of the case.

Upon the whole, after the best consideration that I have been able to give to the subject, it appears to me that on these melancholy occasions the crew are bound to remain by the vessel and contribute their utmost exertions to save as much as possible from the wreck; that if this is done they are always entitled to their full wages if enough is saved for that purpose; but if they abandon the wreck and refuse to aid in saving it, their wages are forfeited. But that they may not rest satisfied with saving what is merely sufficient to pay their wages, and may be induced to persevere in their exertions so long as the chance of saving anything remains, the law, from motives of policy, allows them, according to the circumstances and merits of their services, a further reward in the nature of salvage. The wages are to be paid exclusively from the materials of the ship, but the salvage is a general charge upon the whole mass of property saved. It is not, however, intended to be said that they can claim as general salvors, that is as persons who being under no obligation to the ship engage in this service as volunteers, or that they are entitled to be rewarded at the same liberal rate. Such a ruling might sometimes increase the hazards instead of contributing to the safety of commerce. A crew, who had from any cause become dissatisfied with their officers or owners, might be willing to see the vessel placed in danger, at the risk of some personal peril to themselves, in the hope of obtaining a large reward for rescuing her. But they are to be allowed a reasonable compensation pro opera et labore, as the rule is laid down in many of the old ordinances boni viri arbitrio. If the disaster happens in a foreign country, it ought to be at least a sum sufficient to pay the expenses of their return home. Such, I think, are the principles of the general maritime law. And if they have not been directly, and to their full extent, sanctioned by any judicial decisions in this country, the reasoning of the courts, in the cases which have been cited, appears to lead to the same conclusion.

But it was contended at the argument, whatever may be the doctrines of the general maritime law on this subject, that it has been superseded in this country by the acts of congress, which provide for sending home destitute seamen from foreign countries, at the public expense. The argument proceeds on the ground that the only motive for this allowance is, to furnish the seamen the means of returning home. But the maritime law, as we have seen, places it upon a broader foundation, that of general commercial policy, as well as the intrinsic equity of the claim. It never could have been the intention of these statutes, made for the benefit and relief of seamen, to abridge any of the rights derived from their service under the general maritime law. They have their origin in a great principle of public policy, that of preserving to their country the services of this most useful but most improvident and often destitute class of citizens.

The case at bar was not one of absolute shipwreck, but rather what has been called semi-naufragium. This vessel was brought into port in so damaged a condition, and requiring so large an outlay in repairs to refit her for sea, that for the interest of the owners she was sold as a wreck. Between the owners and the crew she must be considered, for the purposes of this case, either as a wreck, or not a wreck. Upon the latter hypothesis the sale must be considered as voluntary, and then the two months' wages, under the statute, will be due. On the other, the principles of the maritime law will apply. Between the owners and the crew, it appears to me, in the present case; that the true measure of justice will be to consider her to be what the owners treated her as being, a wreck. And as the libellant faithfully performed his duty, so long as his service was required, he is entitled to the benefit of the rule, that in addition to his wages the master shall provide for his expenses home. I shall allow for this purpose one month's additional wages.

NOTE. It is impossible now to determine the precise date of the first publication either of the Judgments of Oleron, or of the Consulate. The common opinion is, that the Consulate is the oldest. But we think that Pardessus, after a very full and elaborate examination of all the evidence on the subject now existing, has shown, not perhaps to a certainty, but with a high degree of probability, that the original articles of the Laws of Oleron, that is, the first twenty-five, were promulgated, and in force, as customary law, long before the existence of the Consulate, in the form in which we now have it. The other articles were added afterwards, at different times and in different places. It is said by Cleirac, in his preface to the Judgments of Oleron, that they were established by Eleonora, duchess of Guienne, on her return from the Holy Land, and were afterwards republished and augmented by her son, Richard I., of England, on his return from the same country. This would carry back the first publication to 1152, and the republication to 1192. Cleirac cites no authority for his statement, but gives it, apparently, as the commonly received opinion of the time; and, on his authority alone, it has been repeated by succeeding writers. His work was published in 1647, five centuries after the supposed establishment of this Code by Eleonora. It is abundantly shown by Pardessus, in his introduction to these laws, that the story of Cleirac is a fable. For instance, Richard did not return from the Holy Land by the way of Aquitaine. He was shipwrecked on his return, at Aquilea, seized and confined as a prisoner by order of the Emperor, Henry VI., from December, 1192, to 1194; and there seems to be about as little reason for believing that these laws were originally framed by Eleonora, as there is that they were republished by her son. Pardessus supposes that the first publication of these laws was in the latter part of the eleventh century, and before the year 1200. But the first certain evidence we have of their existence, is in 1266. They were then translated by order of Alphonso X., king

of Castile, incorporated into a Code under the name of Partidas, and ordered to be observed in all suits between navigators. 1 Pard. Lois Mar. p. 201. They must have been in existence for a considerable period, and have acquired an extensive authority as a common law of the sea, before they would be formally adopted into the legislation of another country. It seems to be equally uncertain where they were first promulgated. All the editions bear the attestation, "Witness the Seal of the Isle of Oleron, 1266;" but as they were certainly published before that time, this is probably only a notarial certificate of a copy taken from one in the public archives of that place. They bear no internal marks of having been originally made at Oleron, and they in fact constituted the common law, not only of the ports of Aquitaine, to which Oleron belonged, but of the ports of Brittany, Normandy, and the whole western coast of France. There is quite as much uncertainty as to the precise epoch of the appearance of the Consulate of the Sea. It was probably some time in the fourteenth century. The first document in which it is mentioned is an ordinance of the magistrates of Barcelona, in 1435. Some of the editions of the Consulate contain a document which declares that it was adopted as law by the public authorities of a large number of states on the Mediterranean sea, commencing with the year 1095, and ending in 1270. But this document is manifestly spurious. The original Consulate was written in the Romanesque language, a dialect of the Provencal and Catalan, which was the common language of the southern coasts of France and Spain. It may, therefore, safely be presumed that it had its origin in one of these countries, and probably the author, or authors, if there were more than one, belonged to Marseilles or Barcelona, as the usages, moneys, and measures mentioned in the Consulate were common to these two ports. But the work itself shows that it was not all produced at once, but additions were made from time to time. Pardessus thinks that the probabilities are in favor of Barcelona; the language in which it is written is in fact still spoken in that part of Spain. In comparing the Roles of Oleron with the Consulate, one can hardly doubt that the former are the more ancient. They have all the marks of a primitive compilation, a first rude and imperfect essay toward a digest of the law of the seas. The whole of the primitive Roles is comprised in twenty-five short articles, treating but few subjects, and those in a style of great simplicity, with very little development. But the Consulate is extended to two hundred and fifty-two chapters, and was evidently intended as a complete and systematic digest of the whole law, as far as it was then established in practice. Principles are largely developed, with distinctions and limitations, showing that the law must then have arrived to a state of great maturity. Most of the original articles of the Laws of Oleron are found in the Consulate, and some of them in the same words. Cleirac has inferred from this fact that the compilers of the Laws of Oleron borrowed from the Consulate. But if they had possessed this rich and copious collection, is it probable that they would have confined themselves to so small a number of articles? It is scarcely credible that they should not have taken more. Besides, when the articles of Oleron appear in the Consulate, they are found improved and more fully developed, showing that they were probably borrowed from that source, and were altered and amended to conform to the jurisprudence of that time. The Consulate must have been written at a time when the science of maritime law was in a much more advanced state than it was at the era of the Roles of Oleron. Pardessus has shown, in his introduction to these two compilations, that the Consulate must have been nearly two centuries posterior to the Roles. Many, however, of the laws and customs from which the authors of

that work have derived their materials, may have existed, and probably did exist, as customs in the Mediterranean, before the epoch of the Laws of Oleron.